AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| One Black Samsung cellphone IMEI 357518/05/639768/0, One Black LG cellphone IMEI 353712-09944072-2, | ) | |
| One Black Samsung cellphone serial number R28K63BGJEN, | ) | Case No. 19-sw-27 |
| One Black Samsung cellphone serial number R28KS2MSGHJ, | ) | |
| One Gray Samsung IMEI 359652063037647, | ) | |
| One White IPhone FCC ID BCG-E2946A and | ) | |
| One White iphone with purple case IMEI 356564084652226 | ) | |
| CURRENTLY LOCATED AT 90 K Street, NE, Washington, D.C. | | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein.

located in the _____ District of _____ Columbia _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Illegal poss. firearm |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Herbert LeBoo, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:  01/25/2019 _____

_____
*Judge's signature*

City and state:  Washington, D.C. _____

Deborah A. Robinson
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means      ☑ Original      ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *One Black Samsung cellphone IMEI 357518/05/639768/0,* | ) |
| *One Black LG cellphone IMEI 353712-09944072-2,* | ) |
| *One Black Samsung cellphone serial number R28K63BGJEN,* | )   Case No.  19-sw-27 |
| *One Black Samsung cellphone serial number R28KS2MSGHJ,* | ) |
| *One Gray Samsung IMEI 359652063037647,* | ) |
| *One White IPhone FCC ID BCG-E2946A and* | ) |
| *One White iPhone with purple case IMEI 356564084652226* | ) |
| *CURRENTLY LOCATED AT 90 K Street, NE, Washington, D.C.* | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 8, 2019 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Deborah A. Robinson _____.
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____.

Date and time issued:   _____ 01/25/2019 3:00 pm _____      _____
                                                                                            *Judge's signature*

City and state:   Washington, D.C. _____      _____ Deborah A. Robinson, Magistrate Judge _____
                                                                                    *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  19-sw-27 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

*Property to be searched*

The electronic devices to be search are described as follows:

**<u>Device 1</u>**:  One Black Samsung cellphone IMEI 357518/05/639768/0

**<u>Device 2</u>**:  One Black LG cellphone IMEI 353712-09944072-2

**<u>Device 3</u>**:  One Black Samsung cellphone serial number R28K63BGJEN

**<u>Device 4</u>**:  One Black Samsung cellphone serial number R28KS2MSGHJ

**<u>Device 5</u>**:  One Gray Samsung IMEI 359652063037647

**<u>Device 6</u>**:  One White IPhone FCC ID BCG-E2946A

**<u>Device 7</u>**:  One White iPhone with purple case IMEI 356564084652226

The Devices are currently located at the ATF Washington Field Division located at 90 K

Street, Northeast, Washington, D.C.

**ATTACHMENT B**

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities of violations of Title 18, United States Code, Section 371 and 922(g)(1) including, but not limited to:

    a.  Records and information relating to a conspiracy to engage in the illegal business of dealing in firearms without a license;

    b.  Records and information relating to unknown co-conspirators involved in the business of dealing in firearms without a license and records and information relating to the identity of individuals buying firearms from the conspirators;

    c.  Records and information relating to the acquisition, storage, and sale of firearms, including photographs of firearms for sale and text messages or other communications wherein the user of the Device is communicating with potential buyers of firearms;

    d.  Records and information relating to proceeds from the sale of firearms as well as the location of the proceeds;

    e.  Evidence of who used, owned, or controlled the Devices such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    f.  Evidence of the times the Devices were used;

g.  Records of or information about Internet Protocol addresses used by the Devices;

h.  Records of or information about the Devices' Internet activity, related to the above offenses, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>One Black Samsung cellphone IMEI 357518/05/639768/0,<br><br>One Black LG cellphone IMEI 353712-09944072-2,<br><br>One Black Samsung cellphone serial number R28K63BGJEN,<br><br>One Black Samsung cellphone serial number R28KS2MSGHJ,<br><br>One Gray Samsung IMEI 359652063037647,<br><br>One White IPhone FCC ID BCG-E2946A and<br><br>One White iPhone with purple case IMEI 356564084652226<br><br>CURRENTLY LOCATED AT 90 K Street, NE, Washington, D.C. | CASE NO. 19-sw-27 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Herbert A. LeBoo III, Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") ("your affiant"), being duly sworn, depose and state the following**:**        **INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — One Black Samsung cellphone IMEI 357518/05/639768/0, One Black LG cellphone IMEI 353712-09944072-2, One Black Samsung cellphone serial number R28K63BGJEN, One Black

Samsung cellphone serial number R28KS2MSGHJ, One Gray Samsung IMEI 359652063037647, One White IPhone FCC ID BCG-E2946A and One White iPhone with purple case IMEI 356564084652226, which are currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.    As an ATF Task Force Officer ("TFO"), your affiant is "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.    Your affiant, Officer Herbert A. LeBoo III has been a member of the Metropolitan Police Department ("MPD") for more than Fourteen years, and is currently assigned to the Narcotics & Special Investigations Division/Gun Recovery Unit. In July of 2013, I was detailed to the ATF. In June of 2014, I was sworn and deputized as a Task Force Officer for ATF, and since that time, have been detailed with the ATF High Intensity Drug Trafficking Area ("HIDTA") unit.

4.    During my tenure as a law enforcement officer, I have been involved in more than 500 narcotics and weapons-related arrests and specialize in investigating violations of narcotics and firearm laws in the District of Columbia and the United States and am familiar with the methods narcotics traffickers use to traffic narcotics and firearms in the Washington, D.C. area. I am responsible for investigations involving specified unlawful activities, to include violent crimes involving firearms that occur in the District of Columbia. I am also responsible for enforcing federal firearms and explosives laws, and investigating other unlawful activities, to include narcotics trafficking and money laundering, occurring in the District of Columbia.  Your

affiant received training on the proper investigative techniques for these violations, including the identification of firearms and location of the firearms' original location of manufacture and assembly.  Your affiant has actively participated in investigations of criminal activity, including but not limited to, the investigation of armed drug traffickers and money launderers.   I have also personally conducted and participated in investigations that have resulted in the arrests and convictions of individuals responsible for trafficking narcotics and firearms, and have testified under oath about my investigations and findings. I have also been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; executing search warrants and arrest warrants which resulted in seizures of illegal narcotics, firearms, and other narcotics contraband.

5.      Based upon my training and experience and the training and experience of other Special Agents with the ATF, I know that subjects who traffic in firearm and illegally purchase and possess firearms, often take pictures or videos of the firearms using their cellular telephones. These photographs and videos are then stored on the cellular telephones and personal computers. These subjects are also known to communicate with potential firearms buyers by sending text messages and e-mails to buyers including photographs and videos of the firearms along with the asking prices. These pictures or videos are strong evidence of illegal gun trafficking and are commonly kept at the gun possessor's residence along with gun paraphernalia. Aside from interacting with potential buyers, subjects involved in the illegal business of dealing in firearms also store images and videos of their criminal activity so they can show their friends and associates the offenses that they have committed in order to earn the respect of their friends and their associates.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.     The property to be searched are the following devices listed below:

a.   One Black Samsung cellphone IMEI 357518/05/639768/0 (**DEVICE-1**), One Black LG cellphone IMEI 353712-09944072-2 (**DEVICE-2**) (collectively, "Lanham Lane Devices") both recovered on November 16, 2018, at 7401 Lanham Lane Fort Washington, Maryland.

b.   One Black Samsung cellphone serial number R28K63BGJEN (**DEVICE-3**), One Black Samsung cellphone serial number R28KS2MSGHJ (**DEVICE-4**), One Gray Samsung IMEI 359652063037647 (**DEVICE-5**), One White IPhone FCC ID BCG-E2946A (**DEVICE-6**) and One White iPhone with purple case IMEI 356564084652226 (**DEVICE-7**), (collectively, "Rochelle Avenue Devices") also recovered on November 16, 2018 at 1908 Rochell Avenue Apartment 1513, District Heights, Maryland.

c.   For the purposes of this affidavit the devices collectively, when referring to the Lanham Lane Devices and Rochelle Avenue Devices, your affiant will refer to them as "The Devices."

7.     The Devices are currently located at 90 K Street, Northeast, Washington, D.C., also known as the ATF Washington Field Division Offices.

## PROBABLE CAUSE

8.     On July 27, 2018, ATF Falls Church Group II (Washington Field Division) recovered nine firearms during a firearms trafficking investigation and arrest in Southeast, Washington, D.C. ATF subsequently learned through further investigation that the individuals arrested with the nine firearms on July 27, 2017 were responsible for purchasing a total of thirty-

4

one (31) firearms in the previous month. Twenty-two (22) of the thirty-one (31) firearms were sold on the streets of the District of Columbia or in the State of Maryland.

9.     On August 14, 2018, investigators interviewed a cooperating witness ("CW") and learned that at least four adult male individuals had purchased firearms illegally from the CW and the CW's co-defendant ("Green").[1]  The CW viewed confirmation photos of each individual, and positively identified each one of them as people that purchased firearms from CW and Green.

10.     One of the individuals identified by the CW was JUAN EVERETT JONES ("JONES), also known as "Hollywood."

11.     JONES has a prior conviction for Mayhem While Armed, Aggravated Assault while Armed, and Possession of a Firearm During a Crime of Violence. JONES is currently serving a term of parole related to this conviction. JONES is therefore prohibited from possessing firearms pursuant to Title 18, United States Code, Section 922(g)(1).

12.     The CW identified JONES as one of the individuals that purchased firearms from the CW and Green.  The CW stated that JONES purchased two firearms from the CW and Green, a .40 caliber semi-automatic and a .45 caliber semi-automatic.  The CW also stated that JONES is a human trafficker ("pimp"), and drives a black Chrysler 300.

13.     A review of the CW's cellphone text records revealed numerous conversations between JONES and the CW, discussing the purchasing of firearm over their respective cellular telephones.

---

[1] CW has entered a guilty plea to one count of traveling in interstate commerce to purchase firearms for illegal re-sale in violation of Title 18, United States Code, Section 924(n). CW is assisting the Government in future prosecuting and is expecting to receive a reduction in CW's ultimate sentence.

14.     On July 23, 2018, CW sent JONES a text message with a photo of several firearms for sale. CW sent JONES a list of firearms for sale along with the prices. It read, "Two .40 700 each, Black .9 500, .380 400, Maroon. 9 600, .25 350." JONES responded by text message and said that he had $2,000 to buy the lot of firearms. CW replied, "You can get the 2 .40s and the red .9 for that." JONES replied, "Throw in the other 9 in there and we have a deal."

15.     On July 24, 2017, JONES sent a text message to CW stating "Prices. Are crazy. Tell cuz [Green] ill take those off his hands but work wit me since I'm getting more than 1." JONES followed up with a text message stating "I got 1700 for them. I already got work but ill take more if the price right." The CW and JONES then discussed a meeting time for the firearm sale. The CW told JONES that she was running behind because, "[t]he metal on the .40 is something else. Cant get the ###### off," referring to the firearm serial numbers. CW followed up asking if JONES was "still around," and JONES replied by sending his address, "1900 Rochelle ave district heights md." CW then confirmed with JONES that CW was bringing him two firearms for purchase, the "nina n .45."

16.     The CW then met JONES and sold him two firearms.  Later on the same night, JONES sent the CW a text message stating "I got it back right. Just had to slide it a little further. Still want that 40 tho wit the 16. Need that," referring to another firearm that can hold 16 rounds of ammunition.

17.     On July 25, 2018, the CW and JONES exchanged several additional text messages about firearms for sale and associated prices. JONES asked several questions about the firearms for sale, including "What the40 hold n how many clips?"

18.     On July 27, 2018, CW sent JONES a text message letting him know that the CW and Green were traveling to the Dulles gun show and the CW asked him "did you want me to

look for anything while I'm there." JONES responded through text message stating "Yes mam. 20 or 30 rounder clip for the 40 n 45 I bought. Also a Mac(45 caliber) machine g. or Uzi(9mm)machine g." JONES sent a follow up text messages asking for, "A beam for the 45 as well." CW asked JONES what his prince range was for the firearms and JONES responded "Regular legs [Magazines] be like 25 to 75. A 30rd drum about 75 to 100. . . Mac or Uzi fully auto only 1500 for either."

19.    The CW and Green were arrested later in the day as they entered the District of Columbia. Four firearms were recovered from their car and five more firearms were recovered from their apartment.

20.    During the course of this investigation, your affiant (along with other investigators) were able to identify two locations where JONES permanently and periodically resides.

21.    On November 16, 2018, members of the ATF Task Force executed two federal court search warrants at these locations, 1908 Rochelle Avenue apartment 1513, District Heights, Maryland [2] and 7401 Lanham Lane Fort Washington, Maryland.[3]

---

[2] JONES had been observed multiple times coming and going from this location and his automobile had similarly been observed parked in front of the location on several occasions. This address is also a similar address to the location JONES provided to CW as a meeting place for the firearm transaction in July of 2018.

[3] Law enforcement officers in a related case obtained authorization to use GPS information to track the phone number used by JONES in or around October 29, 2018. The GPS information showed that JONES frequented the Lanham Lane address during the day and the Rochelle Avenue address at night and the early morning. A Maryland Motor Vehicles Administration (MVA) query also revealed that JONES listed the Lanham Lane address for his Class C drivers license. On October 3, 2018, JONES was involved in a traffic accident and provided the Lanham Lane address as his address in the police report.

22.     JONES was located at 1908 Rochelle Avenue apartment 1513, District Heights, Maryland.  Task force members located and recovered mail material, marijuana, and the Rochelle Avenue Devices.

23.     At the 7401 Lanham Lane Fort Washington, Maryland location, Task force members encountered "Robert Jones," the brother of JUAN JONES.  Task force members located and recovered the Lanham Lane Devices, mail material, ammunition, and two firearms. One of the firearms recovered (Black Taurus model PT840C, serial # OBLITERATED, .40-caliber semi-automatic handgun), is the exact make and model purchased by the CW. It should also be noted that the ATF lab has restored the obliterated serial, and the above listed recovered firearm is found to be the exact firearm purchased by CW and sold to JONES during the course of this conspiracy. Your affiant knows this to be the case because law enforcement has pulled all of the firearms transaction records for firearms purchased by CW during the conspiracy and the records contain the serial numbers and make and models of the firearms purchased.

24.     On December 20, 2018, JONES was charged in a one count indictment in the District Court for the District of Columbia with conspiring with CW and Green to commit several crimes against the United States, in violation of Title 18, United States Code, Section 371. (18-CR-386 (APM)). The object of the conspiracy was to violate criminal code sections including Title 18, United States Code, Sections 922(a)(5), 922(a)(6), 922(d), and 922(k).

25.     Based on the above facts, your affiant therefore believes that the Devices will contain incriminating evidence including text messages, photographs, and videos, relating to the offense that JONES was charged with, Conspiracy to violate the laws of the United States, in violation of Title 18, United States Code, Section 371, and that the information described in Attachment B remains stored on the Devices to be searched.

26.     The Devices are currently in the lawful possession of the ATF and stored at the Washington Field Division of ATF located at 90 K Street, Northeast, Washington, D.C. The Devices came into the ATF's possession in the following way: The Devices were recovered during the execution of search warrants at 1908 Rochell Avenue District Heights Maryland and 7401 Lanham Lane Fort Washington, Maryland on November 16, 2018. Therefore, while the ATF might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

## TECHNICAL TERMS

27.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.   "Digital device," as used herein, includes the following three terms and their respective definitions:

i.   A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

    ii.  "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

    iii.  "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

  b.  "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.   "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

            i.   "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other

digital form. It commonly includes programs to run operating systems, applications, and utilities.

ii.     The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

iii.    "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

iv.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the

user in order to allow the user speedier access to and interaction with that website.

v. "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

28. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online I know that the Devices have the capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. The Devices have the capabilities that allow them to store documents, photographs, records, and they have the ability to access the internet and access webpages. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

**COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS**

29.    As described above and in Attachment B, this application seeks permission to search for information that might be found within the Devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device**s** for at least the following reasons:

a.   Individuals who engage in criminal activity, including engaging in the illegal business of dealing in firearms without a license, illegally purchasing firearms, and illegally possessing firearms, use digital devices, like the Devices, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Devices, documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages like the messages exchanged between CW and JONES during the course of the conspiracy; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts, to  keep track of co-conspirator's contact information; keep a record of illegal transactions for future reference; and keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators.

b.   Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.  Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

30.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that

15

establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Devices at issue here because:

31.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can

record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

32.     Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

33.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

34.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

35.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

36.     I know that when an individual uses a digital device to engage in the illegal business of dealing in firearms without a license, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

37.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.  Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or

portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c. Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital

device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps"

that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.   Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.   Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

g.   In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

i.   The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

ii.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain

pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

iii.   In searching the digital devices, the forensic examiners may examine as much of the contents of the devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

**AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

38.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

39.     I respectfully submit that this affidavit supports probable cause for a warrant to search the Devices described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

HERBERT LEBOO
TASK FORCE OFFICER
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES

Subscribed and sworn to before me
on January 24, 2019.

UNITED STATES MAGISTRATE JUDGE